

04 CV 9441

Laurence D. Paskowitz (LP-7324)
PASKOWITZ & ASSOCIATES
60 East 42nd Street--46th Floor
New York, New York 10165
(212) 685-0969 (tel.)
(212) 685-2306 (fax)

RECEIVED
DEC 02 2004
U.S.D.C. S.D.N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------x

FREEPORT PARTNERS, LLC,                    :

            Plaintiff,                      :

      --against --                         :          CIV. NO.

JACK FRIEDMAN, STEPHEN                     :
BERMAN, and JOEL BENNETT,                  :

            Defendants.                     :

      --and--                              :

JAKKS PACIFIC, INC.,                       :          JURY TRIAL DEMANDED

                                           :

            Nominal Defendant.             :

------------------------------------------------x

       Plaintiff, by its attorneys, submits this shareholder's derivative complaint against the

defendants named herein.  The allegations are asserted on information and belief, except as to

those matters which relate to plaintiff and its own acts, which are asserted on personal

knowledge.

## NATURE OF THE ACTION

       1.     This is a shareholder derivative action brought for the benefit of nominal

defendant JAKKS Pacific, Inc. ("JAKKS" or the "Company") against its top executive officers

to recover damages inflicted upon JAKKS by their actions in connection with an asserted bribery scheme relating to a key licensing contract JAKKS obtained from World Wrestling Entertainment, Inc. ("WWE"). On October 19, 2004 WWE brought suit against JAKKS and certain additional defendants (including the individual defendants named herein) seeking damages for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Robinson-Patman Act, and state law prohibitions against commercial bribery, fraud and tortious interference with contractual relations (the "WWE Action").

2.      JAKKS, which is publicly traded on the NASDAQ National Market System, multi-line, multi-brand toy company that designs, develops, produces and markets toys and related products. The Company focuses its business on acquiring or licensing well-recognized trademarks and brand names with long product histories. In addition to developing its proprietary brands and marks, JAKKS licenses brands such as World Wrestling Entertainment (WWE), Nickelodeon, Rugrats, Dora the Explorer, Blue's Clues, SpongeBob SquarePants, Mickey Mouse, Winnie the Pooh, Kim Possible, Finding Nemo and Hello Kitty. It also licenses technology produced by unaffiliated inventors and product developers to improve the design and functionality of its products.

3.      The WWE Action asserts a pattern of multifaceted racketeering activities in connection with a commercial bribery scheme to obtain a lucrative videogame license, and amendments to toy licenses, issued by WWE

4.      The two licenses at issue herein were and are extremely lucrative licenses which were expected to and did produce millions of dollars in profits to the licensees. JAKKS' stock valuation was expected to increase if the revenues from the videogame license and amendments to the toy licenses could be secured.

2

5.     At all times relevant hereto, Defendants Jack Friedman, Stephen Berman and Joel Bennett were the highest ranking executives of JAKKS. Individually and collectively, they were and are in a position to control the affairs of JAKKS and foreign subsidiaries owned by JAKKS which were allegedly used to both implement and conceal the commercial bribery scheme set forth herein.

6.     WWE has asserted that Defendants Friedman, Berman and Bennett realized they would recognize several million dollars in personal profits as a result of stock ownership and options in JAKKS if the videogame license and the amendments to the toy licenses were secured.

7.     WWE further asserted that these Defendants have acted through the years in concert to conceal the unlawful scheme and commercial bribes set forth herein by a variety of tactics, including laundering the bribes through foreign corporations and bank accounts, falsification of corporate accounting records, destruction of physical evidence, falsification of physical evidence, incomplete and knowingly false responses to subpoenas duces tecum and false denials that the payments were made when requested by WWE to disclose such payments.

8.     As a consequence of this asserted wrongdoing, JAKKS stands to lose not only the profits it realized from the licenses in question, but also many millions of dollars in additional damages, payable to WWE. Additionally, upon revelation of this controversy, JAKKS shares dropped considerably, and the Company thereby lost over $100 million in market value. Numerous class actions followed, pursuant to which JAKKS has been named as a defendant due to the involved in the alleged scheme by the individual defendants named herein. JAKKS has additionally suffered damages through payment of millions of dollars in attorneys' fees and expenses in connection with this scandal, and more millions of dollars may yet be expended by

JAKKS as the various litigations proceed. It would be unfair and inequitable for the shareholders of JAKKS to bear the direct or indirect burden to pay these damages caused by the individual defendants, and therefore this suit asks the individual defendants to make recompense to the Company.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1332 and 1367. Certain of the claims asserted herein arise under and pursuant to the provisions of the Section 10(b) of the Securties Excahnge Act, 15 U.S.C. § 78(j)(b), and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 (f), presenting federal questions. Plaintiff also asserts pendant common law claims. This action involves claims for more than $75,000 in damages exclusive of interest and costs. Complete diversity is present as Plaintiff is a citizen of Florida, New York and Nevada; defendants Friedman Berman and Bennett are citizens of California; and defendant JAKKS is a citizen of Delaware and California. This action is not a collusive one to confer jurisdiction upon a Court of the United States it otherwise would not have.

10.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b). A number of the wrongful acts and practices contained of herein occurred in this District.

11.    In connection with the violations of law alleged herein, the defendants used the means and instrumentalities of interstate commerce including the United States mail, interstate wire and telephone facilities, the facilities of the national securities markets and the Internet to distribute the false and misleading statements complained of herein.

## PARTIES AND RELEVANT NON-PARTIES

12.     Plaintiff Freeport Partners, LLC is a JAKKS shareholder, and held such shares prior to JAKKS having suffered all or most of the damages alleged herein.

13.     Non-party WWE is a Delaware corporation having its principal place of business at 1241 East Main Street, Stamford, Connecticut 06902. WWE is an integrated media and entertainment company principally engaged in the development, promotion and marketing of television programming, pay-per-view programming and live arena events. In the process, WWE creates colorful characters and personas whose names and likenesses can be licensed to third parties, such as JAKKS.

14.     Nominal Defendant JAKKS is a Delaware corporation with its principal place of business at 22619 Pacific Coast Highway, Suite 250, Malibu, California 390265. JAKKS is in the business of action figures and toys. In connection with the unlawful scheme, JAKKS acted on its own behalf and then on behalf of the Joint Venture, and has benefited greatly from the scheme. JAKKS owns and/or controls Road Champs, Ltd. and JAKKS Pacific, H.K., two entities utilized by JAKKS to effectuate the commercial bribes set forth herein.

15.     Non-party Defendant JAKKS Pacific (H.K.) Limited ("JAKKS Pacific (H.K.))" is a corporation organized under the laws of Hong Kong. The owners of JAKKS Pacific (H.K.) are Defendants Friedman, who owns 1 of 1000 outstanding shares, and JAKKS Pacific, Inc., which owns 999 of 1000 outstanding shares. Defendants Friedman and Berman are directors of JAKKS Pacific (H.K.).

16.     Defendant Jack Friedman ("Friedman") is an individual who resides at 6351 Kanan Dume Road, Malibu, California 90265. At all times relevant hereto, Friedman was the

highest-ranking executive at JAKKS and served, and continues to serve, as Chief Executive Officer and Chairman of the Board of Directors of JAKKS. Together with Defendant Berman, Friedman co-founded JAKKS in or about January 1995.

17.    Defendant Stephen Berman ("Berman") is an individual who resides at 27465 East Winding Way, Malibu, California 90265. During the implementation of the unlawful scheme and bribery payments set forth herein, Berman served as an Executive Vice President of JAKKS. Since January 1, 1999, Berman has served as President, Secretary, and Chief Operating Officer of JAKKS and served, and continues to serve, on the Board of Directors of JAKKS.

18.    Defendant Joel Bennett ("Bennett") is an individual who resides at 6791 Trevino Drive, Moorpark, California 93021. At all times relevant hereto, Bennett was the Chief Financial Officer of JAKKS.  Defendants Friedman, Berman and Bennett will, from time to time, be referred to herein as the "Individual Defendants."

19.    Non-party THQ, Inc. ("THQ") is a Delaware corporation with its principal place of business at 27001 Agoura Road, Suite 325, Calabasas Hills, California 91301. THQ is in the business of videogame marketing and sales. THQ authorized its Joint Venture partner, JAKKS, to act on its behalf and on behalf of the Joint Venture in order to secure the benefits of a videogame license with WWE and/or has ratified the actions of JAKKS set forth herein.

20.    Non-party THQ/JAKKS Pacific LLC ("THQ/JAKKS") is a Delaware limited liability corporation having its principal place of business at 22761 Pacific Coast Highway, Suite 226, Malibu, California 90265. THQ/JAKKS was formed on June 10, 1998 as part of the scheme set forth herein by JAKKS and THQ to be the official licensee for WWE's videogame license. Defendant Berman signed the Certificate of Formation as an authorized person on behalf of the Joint Venture. The Joint Venture has agreements in place detailing the manner in which

revenues from the WWE videogame license will be accounted for and ultimately distributed between THQ and JAKKS.

21.     Non-party Shenker & Associates, Inc. ("SSAI") is a New York corporation with its principal place of business at 25 VanZant Street, Norwalk, Connecticut. SSAI was WWE's licensing agent from in or around April 1995 through June 13, 2000.

22.     Non-party Stanley Shenker ("Shenker") is an individual who resides in New Canaan, Connecticut. Shenker is, and at all times relevant to this Complaint has been, the President and sole owner of SSAI. At all times relevant hereto, Shenker was also the sole owner and alter ego of a foreign corporation known as Stanfull Industrial, Ltd. ("Stanfull") in Hong Kong. Shenker utilized Stanfull for a variety of criminal and fraudulent purposes, including as a money-laundering device to conceal the receipt and payment of bribes and kickbacks, including commercial bribes made by JAKKS utilizing foreign subsidiaries that JAKKS owned and/or controlled.

23.     Non-party Bell Licensing, LLC ("Bell Licensing") is a limited liability company organized amidst the scheme set forth herein by Bell under the laws of Connecticut with its principal place of business located at 405 Silver Creek Lane, Norwalk, Connecticut 06850. Bell Licensing was formed to be a receptacle for bribes paid to Bell to influence him while serving as an executive and fiduciary of WWE, including, but not limited to, the bribes paid him in connection with the scheme described herein. Prior to July 18, 2002, Bell Licensing did business under the name of Bell Consulting, LLC.

24.     Non-party James Bell ("Bell") is an individual who resides in Norwalk, Connecticut. Bell is, and at all times relevant to this Complaint has been, the President and sole owner of Bell Licensing. At all times relevant hereto, Bell utilized Bell Licensing as a money-

laundering device to conceal the receipt of bribes and kickbacks, including payments from SSAI, Shenker, Stanfull and JAKKS.

## THE SCHEME ASSERTED IN THE WWE LITIGATION

25.    The allegations in this section summarize the essential allegations of the WWE Litigation.

26.    In or around March 1995, WWE hired Bell as its Director of Domestic Licensing. In October 1996, Bell became Senior Vice President of Licensing and Merchandising, a position he held until his termination on March 24, 2000.

27.    As Senior Vice President of Licensing and Merchandising, Bell occupied a fiduciary position and was responsible for, among other things: (i) procuring licensees for WWE; (ii) negotiating license agreements between WWE and potential licensees; (iii) managing WWE's licensing arrangements with its licensees; and (iv) all other activities necessary and/or attendant to the development and maintenance of WWE's licensing program. Pursuant to WWE's licensing program, licensees were granted the right to utilize WWE intellectual property in connection with the licensees' own goods and/or services.

28.    Shortly after securing his position, Bell urged WWE to hire SSAI as an outside licensing agent, touting to WWE Shenker's reported extensive experience and contacts in the licensing business. For at least ten years prior to Bell's introduction of Shenker to WWE in April 1995, Bell and Shenker had maintained both a business and personal relationship.

29.    On Bell's recommendation, WWE retained SSAI in or around April 1995 originally as a non-exclusive outside licensing agent. As such, SSAI was to procure and negotiate licensing contracts by utilizing Shenker's alleged contacts in the licensing business. Bell was responsible to supervise SSAI in its licensing endeavors and remained responsible to

generate licenses for WWE using his own contacts and by negotiating with prospective licensees who contacted WWE directly.

30.    As a result of their respective positions, Bell, Shenker and SSAI occupied positions of trust and of a fiduciary nature to WWE. During the course of their relationship with WWE, SSAI and Bell both entered into agreements with WWE reflecting and acknowledging their fiduciary roles and unique positions of trust.

31.    After SSAI agreed to be WWE's nonexclusive licensing agent, Friedman approached both Bell and Shenker at a toy fair inquiring whether JAKKS could obtain a toy license from WWE. Bell and Shenker subsequently presented a deal memo to WWE indicating SSAI had procured and negotiated the terms of a toy license with JAKKS. On or about October 24, 1995, WWE and JAKKS entered into a domestic toy license with JAKKS. The term of the original domestic license was to end on December 31, 1997 with a one-year right to renew if JAKKS achieved certain financial requirements.

32.    Prior to becoming the Chairman of the Board of JAKKS, Defendant Friedman had worked in the videogame business. At points in time prior to becoming Chairman of JAKKS, Friedman had an ownership interest in, and was employed by, Defendant THQ.

33.    Unknown to WWE, and undisclosed by SSAI, Shenker, and JAKKS, Shenker entered into financial transactions with JAKKS after the domestic toy license was entered into wherein he agreed to represent JAKKS' interests at the same time he was acting as WWE's agent.

34.    The first such transaction now known to have occurred, despite years of concealment, occurred in early 1996 when Berman entered into an agreement on behalf of JAKKS with Shenker to act as their agent with respect to a toy product of perfumed dolls.

35.    Unknown to WWE, JAKKS was paying Shenker as their agent at the same time

they were ostensibly negotiating amendments to the WWE toy license with Shenker as WWE's agent.

36.     After JAKKS and Shenker entered into a contract for Shenker to be JAKKS' agent on the perfume doll toy, Friedman, Berman and Shenker discussed having Shenker serve as JAKKS' agent with respect to other matters, including acting as JAKKS' agent specifically on WWE matters notwithstanding that he was known to be an agent of WWE.

37.     The conversation discussing JAKKS' desire to retain Shenker to act as their agent on WWE matters occurred at the New York Toy Fair in 1996.

38.     During the conversation regarding Shenker serving as JAKKS' agent on WWE matters at the same time he was a WWE agent, a call was placed by Friedman, Berman and Shenker to Mr. Murray Skala, JAKKS' outside legal counsel and a member of the Board of Directors of JAKKS, regarding the proposed arrangement. Mr. Skala advised all participants in the call that it would be a conflict of interest for Shenker to serve as JAKKS' agent on WWE matters at the same time Shenker was acting as WWE's agent and that such an arrangement could not be done without first making full disclosure to WWE and obtaining their consent.

39.     Following the conversation with JAKKS' corporate counsel, neither Friedman, Berman, Shenker, nor JAKKS disclosed the conversation to WWE nor sought their consent. On information and belief, all three men did not disclose the conversation because they knew WWE would not agree to such an obvious conflict of interest and because disclosure might also cause it to be revealed that Shenker was already acting as JAKKS' agent. Instead, all three men kept the conversation secret and eventually implemented, in or around 1998, a plan whereby Shenker would accept and split bribes from JAKKS with Bell to secure the videogame license and related amendments to the domestic toy license and an international toy license secured by JAKKS

following the aforementioned conversation. The plan devised and implemented by JAKKS and its three highest executives utilized monies laundered through foreign corporations controlled by JAKKS and bank accounts of those foreign corporations in Hong Kong. An essential part of the scheme was that the monies paid as commercial bribes were not recorded anywhere on the financial books and records of JAKKS situated in America at the headquarters of the parent corporation.

40.    On or about February 10, 1997, WWE and JAKKS entered into an international toy license having a term which was to end on December 31, 1999. At no time prior to entering into this license did SSAI, Shenker or JAKKS disclose that Shenker had performed services for JAKKS. Likewise, none of the aforementioned parties disclosed to WWE the conversation about Shenker serving as JAKKS' agent on WWE matters.

41.    On March 7, 1997, WWE and SSAI entered into an agreement (the "Agency Agreement") pursuant to which SSAI became WWE's exclusive outside licensing agent. The Agency Agreement provided that the services thereunder would be performed specifically and primarily by Shenker personally. At the time it entered into the March 7, 1997 Agency Agreement with SSAI, WWE did not know that Shenker had been serving as JAKKS' agent or of the discussions between JAKKS' executives and Shenker aimed at having him be JAKKS' agent at the same time JAKKS knew he was WWE's agent.

42.    Under the contract to be WWE's exclusive outside licensing agent, SSAI was responsible for, inter alia, procuring potential licensees and negotiating the terms of prospective licenses. SSAI was not, however, granted any right to accept licensing proposals or to execute particular agreements on behalf of WWE. Instead, SSAI was to present all licensing proposals it procured and negotiated in deal memo format to Bell, who in turn would recommend to WWE

whether to accept the proposal.

43.    In consideration of the services rendered under the Agency Agreement, SSAI was to receive a commission of eleven percent (11%) of royalties and other consideration paid to WWE with respect to licensing deals specifically negotiated and procured by SSAI which were accepted by WWE. SSAI was not to receive commissions on licensing deals procured and negotiated by Bell, who remained responsible to generate licensing deals using his own contacts and with prospective licensees who contacted WWE.

44.    Under the March 7, 1997 contract, SSAI also was not entitled to commissions on royalties paid to WWE with respect to, inter alia, licenses granted by WWE prior to the commencement of the Agency Agreement. The licenses on which SSAI was not entitled to receive commissions were listed on an Exhibit A to the Agency Agreement. One such license on which SSAI was not entitled to receive commissions was WWE's preexisting videogame license with Acclaim. At the time SSAI entered into the March 7, 1997 Agency Agreement, Acclaim was WWE's exclusive licensee for the manufacture and sale of videogames utilizing WWE intellectual property.

45.    As an existing licensee of WWE, Acclaim was to and did conduct negotiations regarding a renewal of its videogame license with Bell, not SSAI. If the Acclaim license were renewed, SSAI would not receive any commission.

46.    In addition to Acclaim and JAKKS, other companies desired to secure the WWE videogame license including THQ and Activision.

47.    In order to place JAKKS in control of the videogame license, and with the intent to cause SSAI and Bell to breach their fiduciary duties, Defendants Friedman and/or Berman and/orBennett devised and implemented a corrupt scheme to foreclose competition for the

videogame license and to obtain it by the commercial bribery of Shenker and Bell. Pursuant to the scheme, JAKKS agreed to pay monies to Shenker's alter ego—Stanfull—by a series of payments to Stanfull's foreign bank account with the understanding that Shenker would then serve as a conduit for the payment of bribes directly to Bell.

48.    An essential part of the corrupt scheme involved concealment of the payments, both as a necessary corollary of a commercial bribery scheme and as a result of the prior conversation with JAKKS' corporate counsel advising that Shenker could not serve as the agent of JAKKS on WWE matters while at the same time acting as WWE's agent.

49.    The scheme was implemented in early 1998, while negotiations were ongoing regarding the videogame license. At the direction of Defendants Friedman and/or Berman, Shenker caused to be delivered a handwritten invoice from his foreign corporation, Stanfull, to JAKKS' corporate headquarters in California for $80,000. The cursory description contained on the invoice stated it was "For Development of Possible Latex Based Soft Toys with Special Coating" and was dated January 2, 1998. On the invoice, Shenker directed that the payment be made to Stanfull's account at the Hang Seng Bank in Hong Kong. A true and correct copy of the invoice is attached hereto as Exhibit 1.

50.    The January 2, 1998 invoice was a false and fraudulent invoice, known to be by all concerned, and was merely a conduit to secure corporate funds to pay commercial bribes. No contract existed between JAKKS and Stanfull or Shenker for the development of latex based soft toys and neither Shenker nor Stanfull ever developed or delivered such toys to JAKKS pursuant to the January 2, 1998 invoice.

51.    Upon receipt of the January 2, 1998 invoice, JAKKS did not record the invoice, nor any of the ensuing steps it took to pay the invoice, on the financial books and records of the

American parent company to which the invoice had been delivered even though the invoice purported to be, and was, payable by JAKKS and not one of its foreign subsidiaries.

52.    In January of 1998, the internal financial controls of JAKKS known to and implemented by Defendant Bennett as the CFO required the corporate official authorizing payment of an invoice to sign and approve the invoice.

53.    The January 2, 1998 invoice of Stanfull was not signed by the corporate official authorizing payment in the first of many steps designed to conceal the involvement of Friedman and/or Berman in the scheme.

54.    In violation of JAKKS' own internal financial controls requiring a corporate official to sign an invoice approving payment, Defendant Bennett, upon receipt of the January 2, 1998 invoice from Defendant Friedman and/or Berman, took steps to have the invoice paid. Rather than pay the invoice on available funds of the American parent corporation, Defendant Bennett sent it by facsimile to Mr. Will Hons, a foreign agent of JAKKS, in Hong Kong and instructed Hons to make arrangements to pay $40,000 of the invoice to Stanfull.

55.    On or about January 14, 1998, acting upon the direction of Defendant Bennett, $40,000 was, in fact, paid to Stanfull via a series of transactions undertaken with the intent to conceal the transactions and bury them in fraudulent accounting of foreign corporations owned by JAKKS and bank accounts of those foreign subsidiaries.

56.    On January 14, 1998, $40,000 was withdrawn from an account at the Hang Seng Bank in Hong Kong of Road Champs, Ltd. ("Road Champs"), a foreign subsidiary owned and/or controlled by JAKKS. The $40,000 was deposited that same day into Stanfull's bank account at the Hang Seng Bank.

57.    On January 14, 1998, the same day as the JAKKS' monies were deposited into

Stanfull's account, Shenker, acting in concert with JAKKS to conceal the disposition of the

monies, and with the intent of inducing Bell to violate his fiduciary duties, obtained a demand

draft for $20,000 payable to James Bell from the Hang Seng Bank, which he subsequently gave

to Bell upon returning to the United States, thereby splitting the money equally with Bell.

58.    At or around the same time Road Champs paid the $40,000, another foreign

subsidiary owned and/or controlled by JAKKS known as JAKKS Pacific, H.K. sent $40,000 by

wire   transfer to Road Champs to reimburse Road Champs for the $40,000 paid to Stanfull.

59.    The general ledgers of Road Champs were then falsified to conceal completely

the payment to Stanfull. Instead of recording the payment to Stanfull on the general ledger of

Road Champs, the accounting entries made it appear as if the transaction was simply the

intercorporate transfer of monies from JAKKS Pacific, H.K. to Road Champs, with no mention

made on the ledger of the payment to Stanfull.

60.    Shortly after receiving his share of the $40,000 bribe, and without WWE's

knowledge or consent or prior approval, Bell formed Bell Consulting, now known as Bell

Licensing, as a for-profit organization and served as its President. At no time during his

employment with WWE did Bell ever disclose to WWE either the formation or existence of Bell

Licensing or Bell's own role as Bell Licensing's President.

61.    Bell formed Bell Licensing in order to serve as a vehicle for the receipt of illegal

bribes and kickbacks he had received and expected to receive from Shenker, the first of which

was the $20,000 in monies originating with JAKKS laundered through the Hang Seng Bank on

January 14, 1998.

62.    Upon receipt of the $20,000 from Stanfull on or about January 14, 1998 of

monies originating with JAKKS' foreign subsidiaries in the aforementioned series of

transactions, Bell utilized his influence to steer WWE away from even considering the renewal of Acclaim as the videogame licensee. Prior to the payment of the aforementioned bribe, Bell had advised Acclaim that there would be no problem with the renewal of the existing license.

63.     On March 25, 1998, Bell advised Acclaim that he would not even listen to any proposal that Acclaim would make for the renewal of their license. After Acclaim complained to senior management at WWE that it was not being permitted to submit a renewal proposal, Acclaim was told it could do so.

64.     Before Acclaim's formal proposal was ever received, however, Bell initialed a deal memo on March 30, 1998 recommending to senior management at WWE that the videogame license be awarded to "JAKKS Pacific-Electronic Game Division." The deal memo listed SSAI as the agent who had negotiated and procured the deal.

65.     As of March 30, 1998, JAKKS did not even have a videogame division and had no ability to perform a videogame license.

66.     On March 31, 1998, the day after Bell had initialed the deal memo recommending that the videogame license be awarded to JAKKS, Defendant Bennett again directed Will Hons to use JAKKS' foreign subsidiaries to pay another $40,000 to Stanfull. Bennett advised Hons on the day after Bell had recommended to WWE management that it grant the videogame license to JAKKS that it was "imperative" that the funds be available to Stanfull not later than April 2, 1998.

67.     On or about April 2, 1998, JAKKS Pacific, H.K., a foreign subsidiary of JAKKS acting on Bennett's direction, wire transferred another $40,000 into Stanfull's account at the Hang Seng Bank in Hong Kong.

68.     On or about April 7, 1998, as he had done following the first $40,000 payment

from JAKKS, Shenker once again split the money with Bell by obtaining a demand draft from the Hang Seng Bank for $20,000 payable to Bell Consulting, LLC.

69.    On April 8, 1998, WWE management approved the deal memo submitted by Bell and SSAI to grant the videogame license to JAKKS. At that time, WWE was not aware of any of the aforementioned payments to its agents by JAKKS.

70.    On or about April 15, 1998, principally based on Bell's influence, direction and advice, WWE advised Acclaim that it did not intend to renew Acclaim's videogame license.

71.    The actions of SSAI and Bell were in violation of their fiduciary duties, and were in direct response to being paid commercial bribes. Both SSAI and Bell recommended to WWE management that the videogame license be given to JAKKS before even obtaining proposals from other videogame companies interested in independently securing the license.

72.    Following Bell's and SSAI's recommendation that the videogame license be given to JAKKS, a series of events occurred which threatened to expose the illegal scheme.

73.    On April 16, 1998, representatives of THQ met with Bell and Shenker. On information and belief, both Bell and Shenker initially tried to steer THQ away from seeking the videogame license or making a proposal for it, telling THQ that it should consider making a proposal for arcade games and personal computers.

74.    On April 23, 1998, THQ directed a letter to both Bell and Shenker indicating its desire to obtain the videogame license. THQ indicated it would be willing to do a non-exclusive multi-year license with guarantees of several million dollars, competitive royalty rates, significant marketing commitments, and stock purchase warrants. THQ's proposal was clearly superior to the deal with JAKKS which Bell and SSAI had already recommended to WWE management and which had been approved based on their recommendation.

75.    On April 27, 1998, after the aforementioned scheme was effectuated by Defendants, Activision also sent its initial informal proposal to SSAI for the videogame license with WWE. The Activision offer was also clearly superior to the terms offered by JAKKS and which had already been recommended by Bell and approved by WWE. Activision's offer included a higher guaranteed royalty than the JAKKS proposal and included stock options in Activision.

76.    On information and belief, the receipt of the THQ and Activision proposals jeopardized the existing bribery scheme then in place since questions would be raised if WWE went forward with the JAKKS proposed license and later learned that WWE agents, SSAI and Bell, had received clearly superior offers from THQ and Activision.

77.    In order to conceal the scheme and see it to fruition, SSAI and Bell did not provide WWE management with copies of the April 23, 1998 letter from THQ or the April 27, 1998 Activision informal proposal.

78.    On information and belief, Shenker and/or Bell advised JAKKS of the terms of Activision's offer and of THQ's interest and the need to increase their offer so as to avoid detection of their scheme.

79.    Having obtained WWE's agreement to grant the videogame license to JAKKS via the aforementioned scheme, and in order to get a cut of the anticipated revenues from the anticipated revenues associated with the videogame license, JAKKS then solicited THQ to become a Joint Venture partner instead of submitting an independent proposal on behalf of THQ. THQ agreed to become a Joint Venture partner with JAKKS on the videogame license instead of making its own formal and independent proposal, and agreed to pay JAKKS monies which otherwise would have, and should have, been promised to WWE in an independent proposal.

THQ did so as consideration for JAKKS' role in securing the license. For all intents and purposes, JAKKS and THQ both knew that the videogame license would be performed by THQ as JAKKS had no ability to perform a videogame license.

80.    The Joint Venture of THQ and JAKKS then submitted a proposal designed to be competitive with the Activision proposal, including stock options in both JAKKS and THQ.

81.    As additional inducement to Bell, Shenker, individually, as a corporate officer of SSAI, and/or while acting as an undisclosed agent of JAKKS, promised Bell that SSAI would split equally with Bell all commissions and other considerations he would receive if Bell recommended the videogame license be given to the Joint Venture between THQ and JAKKS.

82.    SSAI, Shenker and Bell agreed to the corrupt scheme of the joint venture knowing that JAKKS would receive monies which otherwise would have went to their principal in a true competitive bidding situation, and agreed to take all action necessary to recommend to WWE management that the videogame license be awarded to the joint venture instead of the only remaining candidate for the license, Activision.

83.    As a result of the unlawful scheme, the joint venture proposed and SSAI, Shenker and Bell agreed to recommend to WWE that the videogame license be of the extraordinary length of ten years with a five-year right of renewal to be vested in the joint venture.

84.    By recommending a license of extraordinary length, SSAI, Shenker and Bell stood personally to make millions in illegal profits at the expense of their principal, WWE, as a result of the bribery scheme to give JAKKS control of the license and to thereby generate a commission stream to SSAI to split equally with Bell for at least ten and potentially fifteen years.

85.    On May 12, 1998, Bell submitted a deal memorandum setting forth the revised

proposal for a videogame license between WWE and the Joint Venture between THQ and JAKKS. The deal memo listed SSAI as the procuring agent.

86.    Bell submitted the May 12, 1998 deal memo to WWE management before even receiving the more formal proposal of Activision, which was sent to Bell late in the day of May 12, 1998. Consistent with their scheme, neither Bell nor SSAI ever sent the formal Activision proposal of May 12, 1998 to WWE management.

87.    On June 10, 1998, the Joint Venture of THQ and JAKKS caused to be filed a Certificate of Formation in Delaware forming THQ & JAKKS Pacific LLC and on that same date executed a videogame license agreement with WWE.

88.    On June 23, 1998, WWE executed a videogame license agreement with THQ/JAKKS effective as of June 10, 1998 (the "videogame license"). The term of the license was to end on December 31, 2009, subject to the right to renew for an additional five years in favor of THQ/JAKKS.

89.    As another central aspect of the corrupt influence of SSAI, Shenker and Bell, which JAKKS had obtained as a result of the aforementioned scheme, JAKKS requested, and SSAI and Bell agreed to recommend, a lengthy extension to the toy licenses to make the term of the licenses coincide with the term of the videogame license. By Agreements dated June 24, 1998, the domestic and international toy licenses between WWE and JAKKS were amended to make the toy licenses coterminous with the videogame license as a necessary and essential part of the commercial bribery scheme.

90.    On July 15, 1998, as a final payment of the bribery scheme, Shenker caused another phony invoice to be delivered to JAKKS' corporate headquarters in Malibu, California for $20,000 with a false and fraudulent description for the charges. The fraudulent invoice dated

July 15, 1998 was sent to the attention of Berman. As he had done before, Bennett directed an overseas agent of a JAKKS' foreign subsidiary to make the payment.

91.    On April 3, 1998, Bennett was advised by overseas agents of a JAKKS' subsidiary that the $20,000 had, in fact, been paid to Stanfull. The payment, once again, was made by Road Champs to Stanfull's account at the Hang Seng Bank.

92.    On October 8, 1998, Bell Licensing invoiced Stanfull for the $20,000. On October 9, 1998, Shenker caused the invoice to be paid to Bell Licensing on funds drawn from SSAI's account.

93.    At no time during the negotiation of the videogame license with the Joint Venture or the amendment to the toy licenses with JAKKS did Defendants disclose the existence of the bribery scheme or the series of payments made by JAKKS through foreign subsidiaries to Stanfull and to Bell.

**The Alleged Coverup**

94.    Following the corruption of Shenker and Bell and the inducement to breach their fiduciary duties in connection with the videogame license and amendments to the toy licenses, Shenker and Bell expanded their criminal activity by agreements to split commissions on other licensing deals approved by Bell and/or assigned to SSAI by Bell. All the illegal activity was affirmatively concealed from WWE by SSAI, Shenker and Bell.

95.    On March 24, 2000, WWE terminated Bell's employment with WWE for reasons unrelated to Bell's receipt of bribes and kickbacks, none of which were known to WWE at the time.

96.    On June 13, 2000, WWE terminated the contract of SSAI pursuant to a provision which entitled it to do so for a change in business direction.

97.     In October of 2000, SSAI brought an action against WWE for breach of contract in Connecticut state court seeking to be paid commissions on licenses SSAI had allegedly procured, including the toy and videogame licenses (the "Shenker litigation").

98.     At various times following the initiation of the Shenker litigation, Shenker, Bell, Friedman, Berman and Bennett, individually and as agents of the corporations they each own and control, as well as JAKKS, the Joint Venture, THQ/JAKKS, have acted in concert to conceal the unlawful scheme and bribes. All involved first concealed and denied the fact of payments to Stanfull and the use of foreign accounts to do so. After WWE eventually learned about the payments during discovery in the Shenker litigation, the Defendants directly involved in the payments gave false and inconsistent explanations for the payments, none of which are corroborated by any evidence.

99.     In an early attempt to make sure the payments were never discovered in the Shenker litigation, Defendant Friedman telephoned Linda McMahon, the CEO of WWE, and made an unsolicited offer during the early phase of the Shenker litigation to use his good graces with Shenker to broker a settlement of the Shenker litigation. WWE declined his offer.

100.    In the early phases of the Shenker litigation, Bell and Shenker acted in concert and destroyed invoices Bell had sent to Shenker for the bribes he had been promised, including invoices related to the bribes promised him in connection with the unlawful scheme set forth herein. Bell and Shenker also destroyed contracts they had related to the bribery scheme at issue herein.

101.    As a further part of the conspiracy, Shenker committed perjury and failed to disclose the existence of Stanfull when asked if he owned any corporations other than SSAI. Shenker committed perjury in order to conceal the payments originating with JAKKS made to

Stanfull's foreign bank account.

102.    To further the coverup and conceal their criminal conduct, Shenker and Bell both perjured themselves in the Shenker litigation and testified that neither SSAI nor Shenker had made any payments to Bell relating to WWE licenses. In actual fact, Shenker had made directly, or via money laundered through foreign accounts he controlled, payments in excess of $1,000,000 to Bell and/or Bell Licensing as commercial bribes, including payments of hundreds of thousands of dollars of bribes paid in connection with the scheme surrounding the videogame license and amendments to the toy licenses.

103.    During the same time Shenker and Bell were obstructing justice as set forth above, THQ and JAKKS both represented that no payments had been made to Stanfull, SSAI, Shenker and/or Bell. In response to repeated requests by WWE, pursuant to (i) subpoenas duces tecum served in connection with the Shenker litigation; (ii) audits of both THQ and JAKKS' books and records; and (iii) communications from their legal counsel, all uniformly denied making any payments to Stanfull, SSAI, Shenker and/or Bell.

104.    By subpoena dated June 11, 2002, JAKKS was ordered to produce a variety of records relating to its dealings with Shenker and Bell, including all documents relating to any agreements between JAKKS and Shenker and/or SSAI and all documents relating to any payments made to SSAI and/or Shenker.

105.    JAKKS' production of records in response to the subpoena was done by letter dated October 30, 2002. JAKKS concealed and did not produce either the $80,000 or the $20,000 invoice it paid to Stanfull in 1998 or any other documentation indicating such payments had been made. JAKKS also concealed, and did not produce, documents which demonstrated

Shenker had acted as their agent. JAKKS' response to the subpoena gave no indication that monies had, in fact, been paid to Shenker.

106.    In order to police JAKKS' compliance with the license, WWE exercised its right to audit the books and records of JAKKS in early 2003.

107.    On January 14, 2003, WWE's auditors formally requested, in writing, that JAKKS provide the auditors with a complete listing of all payments made by JAKKS to Shenker, SSAI, Bell and/or Stanfull.

108.    On January 17, 2003, JAKKS provided yet another false and misleading response to the auditors request of January 14, 2003 by stating that they had already "provided any documents that may exist" in response to the June 11, 2002 subpoena. As JAKKS knew, it had not produced any documents evidencing payments to Shenker, SSAI or Stanfull in response to the June 11, 2002 subpoena even though such records existed. Joel Bennett received a copy of JAKKS' false response to WWE's auditors and did nothing to correct it despite his knowledge of the payments at issue, all of which he had personally directed and orchestrated.

109.    By email dated February 25, 2003, WWE's auditors responded to JAKKS' January 17, 2003 misleading response by pointing out that JAKKS had not provided any documents related to payments to Shenker, SSAI or Stanfull in response to the June 11, 2002 subpoena and again asked for copies of all invoices or a description of each transaction whereby payments were made by JAKKS to Shenker, SSAI and/or Stanfull.

110.    On February 25, 2003, in an email response from employees working under the direct supervision of Joel Bennett, JAKKS did not respond and disclose the payments but instead advised that the request had been forwarded to their attorney who would advise shortly.

111.    By March 14, 2003, no response had been received from JAKKS' attorneys to the

request for disclosure of payments to SSAI, Shenker and Stanfull. By letter dated March 14, 2003 sent to JAKKS' corporate counsel, Mr. Murray Skala, WWE again requested an answer to the question of whether payments had been made to Shenker, SSAI and Stanfull.

112.    On March 19, 2003, JAKKS, through its counsel, continued the practice of providing false and misleading information. By letter of that date, JAKKS' counsel reiterated the false theme that "the specific information requested was provided months ago" in response to the subpoena. Such statements were false and known by JAKKS to be false, as JAKKS had not provided any information on the payments made to Shenker via Stanfull in 1998.

113.    On March 25, 2003, WWE once again informed JAKKS, through its counsel, that the specific information requested had not been provided and again requested specific disclosure.

114.    On March 26, 2003, JAKKS' counsel acknowledged that the documents provided in response to the June 2002 subpoena did not include documents reflecting payments to Shenker, SSAI or Stanfull, and then represented "there simply is no additional information of the type you seek." Like all previous statements by JAKKS, that statement was false. JAKKS had numerous documents evidencing the payments to Stanfull buried in the records of foreign subsidiaries of the payments.

115.    The repeated refusals to disclose the payments to Stanfull in 1998 were deliberate, in bad faith, and part of a plan to fraudulently conceal the unlawful scheme and commercial bribery set forth herein at all costs. The payments were known to and orchestrated by the highest-ranking executives of JAKKS, who also serve in executive capacities for the Joint Venture. Instead of disclosing the payments, JAKKS repeatedly provided false and misleading information to the effect that no such payments had been made.

116.   In the Shenker litigation, SSAI, Shenker and Bell also acted in concert to conceal both the existence and extent of the unlawful scheme and bribes and did so during the same time that JAKKS, THQ, the Joint Venture, and JAKKS/THQ were concealing the payments to Stanfull which JAKKS had made via foreign subsidiaries. Bell and Shenker both initially denied that any payments had been made to Bell, and SSAI denied receiving any money from licensees of WWE. When discovery indicated that payments had been made to Bell by Shenker, both falsely claimed the payments were for "development projects" unrelated to WWE. As part of their scheme to conceal their illegal conduct, Bell and Shenker created and then produced in discovery numerous fabricated invoices relating to payments from SSAI and/or Shenker to Bell, and destroyed the true invoices reflecting their bribery scheme. The fabricated invoices were designed to make it appear as if the payments made to Bell were for "developmental projects" unrelated to WWE. In or around September 2002, however, SSAI inadvertently produced to WWE two authentic Bell Licensing invoices it had neglected to destroy and which revealed that Bell Licensing had in fact invoiced SSAI for what was described as "consulting services" with respect to specifically listed WWE licenses. Neither invoice produced at that time listed the videogame license as one of the licenses for which Bell was invoicing SSAI.

117.   In late December 2002, according to WWE, both Shenker and Bell committed serial perjury by testifying that the invoices they had fabricated were the actual and true invoices for the payments SSAI had made to Bell. Their serial perjury became manifest at the end of their respective depositions when the true invoices which had been inadvertently produced were shown to them.

118.   Evidence also surfaced at Bell's deposition in December 2002 that Shenker had paid Bell $20,000 in monies originating with JAKKS. Bell falsely claimed at that time that the

payment was a "finder's fee" for a deal between JAKKS and a company called Playmates, which was also a WWE licensee at one point in time.

119.    Following being caught in manifest perjury, SSAI, through its counsel, advised the Court that Shenker would be recanting his prior testimony. Shenker thereafter spent two months devising what in reality turned out to be just another round of perjury in which he continued to conceal the full extent and purpose of the payments he had received from JAKKS.

120.    On March 3, 2003, Shenker served WWE with alleged formal recantations covering every material aspect of his testimony. The alleged recantations made clear that for months, Shenker had willfully perjured himself in deposition testimony and interrogatory answers. Throughout four days of post-recantation deposition testimony, Shenker repeatedly admitted to giving false and misleading testimony.

121.    In his post-recantation testimony, however, Shenker continued to provide false and incomplete evidence on the payments he had received from JAKKS and split with Bell. He adopted the same story told by Bell in December of 2002 about the only payment known at that time, namely that a $40,000 payment from JAKKS and split with Bell was for brokering a deal in which Playmates sold its inventory and equipment to JAKKS. He did not, however, disclose or admit to receiving any additional monies from JAKKS, and continued to conceal both that he had been paid another $60,000 in 1998 by JAKKS and the details of when the payments were made.

122.    WWE presented the evidence of the foregoing and other dishonest and abusive discovery conduct to the Court in the Shenker Litigation in a motion for sanctions. The Court wrote an opinion dated October 16, 2003 detailing Shenker and Bell's perjurious and corrupt scheme, and substantively finding they committed fraud upon the court which warranted the

dismissal with prejudice of SSAI's claims against WWE.

123.    The Court's opinion explicitly noted that JAKKS was one of the WWE licensees that had paid Shenker and that Shenker perjured himself to conceal Stanfull's existence specifically to cover up its role as a conduit for payments to Shenker and Bell from WWE licensees, including specifically from JAKKS.

124.    As of the time the Court issued its opinion dated October 16, 2003, which noted that Shenker had perjured himself about Stanfull in order to conceal payments from JAKKS, neither THQ or JAKKS had disclosed any payments to Stanfull or Shenker despite prior repeated requests that they do so. Similarly, JAKKS had not corrected the false information provided through its counsel on March 26, 2003 that there was no such information to provide.

125.    JAKKS' failure to disclose such information by October 16, 2003, and correct its prior misrepresentations, was calculated, deliberate and part of a continuation of its plan to conceal the scheme at all costs. Unknown to WWE as of October 16, 2003, JAKKS, through Bennett, had retrieved specific documentary evidence of the payments to Stanfull from its foreign subsidiaries and had provided it to JAKKS' outside counsel not later than the first week of September 2003. Despite their certain knowledge by that time that both JAKKS and its counsel had previously provided false and incorrect information to WWE, neither JAKKS nor its counsel disclosed the information to WWE in September or October of 2003.

126.    After the court issued its October 16, 2003 opinion in the Shenker Litigation, and in violation of specific court orders of compulsion and his promise to do so, Shenker refused to obtain and produce the records of Stanfull's account at the Hang Seng Bank which were needed

to determine the full extent of payments to Stanfull by JAKKS. As a result, WWE was compelled to incur considerable trouble and expense to go to Hong Kong in October 2003 to depose the records custodian of the Hang Seng Bank.

127. In the course of that deposition, WWE confirmed that one $40,000 payment had been made to Stanfull's account by JAKKS H.K. in April 1998—the very time that WWE was considering to whom to award its videogame license. Records further confirmed that the $40,000 payment was then split equally by a demand draft to Bell a few days later. Based on other incomplete records produced in that deposition, it appeared JAKKS had paid Stanfull another $40,000 in January 1998 and $20,000 in August 1998.

128. Immediately following those discoveries, on November 5, 2003, WWE's counsel directed a letter to JAKKS' counsel transmitting the Court's opinion in the Shenker Litigation on WWE's sanction motion and again requested that complete information regarding payments to SSAI, Shenker and/or Stanfull be provided to WWE. By reading the Court's opinion, JAKKS would have known that, despite its consistent prior denials of such payments, WWE was in possession of evidence indicating that payments had been made to Stanfull by JAKKS.

129. On November 11, 2003, Defendant Friedman telephoned WWE's Chief Executive Officer, Linda McMahon, and told her that, in response to WWE's counsel's letter, JAKKS had searched their files and found evidence of payments to Stanfull—the fundamental fact JAKKS previously had outright denied. Defendant Friedman told Mrs. McMahon that the payments were for a perfume deal and $80,000 for "project development" for a mechanical dinosaur project, both of which supposedly were unrelated to WWE.

130. Friedman's statements to Linda McMahon were neither accurate nor complete.

JAKKS had unquestionably forwarded the payment information to its outside counsel not later than the first week of September and had that information for two months before WWE's counsel's letter of November 5, 2003 and had not disclosed it. Additionally, the $80,000 in payments made in January and April of 1998 were not for project development, and Friedman completely failed to disclose the $20,000 payment made to Stanfull in August of 1998 after the videogame license and amendments to the toy licenses had been secured.

131.    On November 14, 2003, despite its previous repeated denials, JAKKS' counsel wrote to WWE's counsel reaffirming Defendant Friedman's statements to Mrs. McMahon and produced for the first time any records relating to the payments made by JAKKS to Stanfull. Among other things, JAKKS produced for the first time the January 2, 1998 $80,000 invoice from Stanfull in Shenker's own handwriting, which Shenker had never produced in the Shenker litigation. JAKKS, through its counsel, did not disclose the $20,000 payment made in August 1998   or the phony invoice behind that payment.

132.    JAKKS alleged explanation for the $80,000 in payments to Stanfull—a "project development" for a mechanical dinosaur project unrelated to WWE—was completely inconsistent with the purported explanation for those payments offered by Shenker and Bell that the payments were a finder's fee for a deal involving WWE licensees, JAKKS and Playmates.

133.    The January 2, 1998 invoice in Shenker's own handwriting did not bill JAKKS for a finder's fee on Playmates as he and Bell had claimed under oath, but rather for the "development of possible latex based soft toys with special coatings." On information and belief, JAKKS concealed this invoice for as long as it could because they knew it was inconsistent with the testimonial positions taken by Shenker and Bell for the payments and because they knew Shenker would have no reason to split the monies with Bell, as he did, if in fact the payments

were for a mechanical dinosaur project unrelated to WWE.

134.    JAKKS produced the invoice only after it knew WWE was aware of the payments and because, as a publicly traded company, it would reasonably be expected to have some form of documentation for such payments.

135.    In January 2004, WWE again deposed representatives of the Hang Seng Bank and confirmed for the first time that in fact three payments had been made to Shenker's Stanfull account in 1998 totaling $100,000.

136.    Defendants have colluded during their coverup on several different occasions. On one occasion during the period he was planning his supposed recantation after being caught in perjury, Shenker directed his legal counsel for SSAI to contact JAKKS' counsel to advise that he would be disclosing that JAKKS paid him money. SSAI's legal counsel did so. Thereafter, Shenker disclosed only what he knew WWE was already aware of - a single $40,000 payment - and, like JAKKS, did not disclose the full range and dates of payments. On another occasion, he directed his counsel to notify JAKKS' counsel that Shenker had provided information regarding statements made by Friedman reflecting Friedman's knowledge that SSAI was splitting his commissions with Bell.

137.    The fraudulent concealment of facts related to the payments continues to this date.  Friedman, Berman and Bennett were all deposed in the Shenker litigation and none identified the person who negotiated the payments to Stanfull or authorized the payments. JAKKS failed to produce a properly prepared corporate representative to testify on that and related subjects and refused to produce certain records, all of which required WWE to seek and obtain compulsion orders from the Court in the Shenker litigation.

## REVELATION OF THE WWE LITIGATION

138.    On October 19, 2004 WWE brought suit against JAKKS and certain

additional defendants (including the individual defendants named herein) seeking damages for

violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Robinson-

Patman Act, and state law prohibitions against commercial bribery, fraud and tortious

interference with contractual relations (the "WWE Action").

In reaction to this news, JAKKS' stock price dropped substantially, and JAKKS

shareholders lost over $100 million in stock value.

139.    On October 19, 2004, JAKKS released a press release over the *Business Wire*

which stated, in relevant part:

> JAKKS Pacific, Inc. (NASDAQ:JAKK) announced that a civil lawsuit was filed
> in the United States District Court for the Southern District of New York
> yesterday afternoon by World Wrestling Entertainment, Inc. ("WWE")
> concerning the video game license between WWE and the joint venture company
> operated by the Company and THQ, Inc. and the toy license between the
> Company and WWE. The Company denies any allegations of wrongdoing and
> believes that it will be completely vindicated in the litigation, and looks forward
> to having the claims against it dismissed. The Company will continue to devote its
> full energies and resources to bringing its outstanding products to market during
> the busy holiday season and beyond.

140.    On October 26, 2004, JAKKS issued another press release, stating in

relevant part:

> THQ(R) Inc. (NASDAQ:THQI) and JAKKS Pacific, Inc. (NASDAQ:JAKK)
> today announced their newest World Wrestling Entertainment(R) (NYSE:WWE)
> licensed video game, "WWE(TM) SmackDown!(TM) Vs. RAW(TM)" for the
> PlayStation(R) 2 computer entertainment system, is in the final steps of
> manufacturing and will begin shipping to retailers throughout North America on
> November 2, 2004.
>
> "WWE SmackDown! Vs. RAW" will be the first WWE videogame to feature
> online play and authentic WWE Superstar voice over. Additionally, THQ and
> JAKKS Pacific announced that "WWE SmackDown! Vs. RAW" will be
> supported by a multi-million dollar marketing campaign including TV, print,

online, exclusive in-program features during WWE programming and promotions with key retail partners.

"The 'SmackDown!' franchise is the best selling wrestling series of all-time and we're backing it with a comprehensive marketing campaign targeting both core wrestling fans and mass-market gamers alike," said Peter Dille, senior vice president of worldwide marketing, THQ. "We worked closely with the WWE creative team to insure that our TV creative delivers the action, attitude and excitement that fans expect from WWE programming."

"'WWE SmackDown! Vs. RAW' is a huge step forward for the franchise, said Nelo Lucich, vice president of interactive, JAKKS Pacific. "With the top superstars from both RAW and SmackDown!, in addition to online play, this game is sure to be a hit this holiday season."

141.    On this news, JAKKS' stock rose, as it appeared that the controversy

between WWE and JAKKS had not seriously affected relations between the two companies.

142.    On November 16, 2004, JAKKS issued another press release which stated, in

relevant part:

THQ(R) Inc. (NASDAQ:THQI) and JAKKS Pacific, Inc. (NASDAQ:JAKK) today announced their newest World Wrestling Entertainment(R) (NYSE:WWE) licensed video game, "WWE(TM) SmackDown!(TM) Vs. RAW(TM)" for the PlayStation(R) 2 computer entertainment system, is in the final steps of manufacturing and will begin shipping to retailers throughout North America on November 2, 2004.

"WWE SmackDown! Vs. RAW" will be the first WWE videogame to feature online play and authentic WWE Superstar voice over. Additionally, THQ and JAKKS Pacific announced that "WWE SmackDown! Vs. RAW" will be supported by a multi-million dollar marketing campaign including TV, print, online, exclusive in-program features during WWE programming and promotions with key retail partners.

"The 'SmackDown!' franchise is the best selling wrestling series of all-time and we're backing it with a comprehensive marketing campaign targeting both core wrestling fans and mass-market gamers alike," said Peter Dille, senior vice president of worldwide marketing, THQ. "We worked closely with the WWE creative team to insure that our TV creative delivers the action, attitude and excitement that fans expect from WWE programming."

"'WWE SmackDown! Vs. RAW' is a huge step forward for the franchise, said Nelo Lucich, vice president of interactive, JAKKS Pacific. "With the top

superstars from both RAW and SmackDown!, in addition to online play, this game is sure to be a hit this holiday season."

143.    However, on November 16, 2004, WWE responded to these press releases as follows:

> LOS ANGELES, Nov 16 (Reuters) - World Wrestling Entertainment Inc. (WWE.N: Quote, Profile, Research) on Tuesday said it did not know why Jakks Pacific Inc. (JAKK.O: Quote, Profile, Research) had issued a press release on an amendment to their video game licensing deal the two sides agreed in July.
>
> World Wrestling Entertainment is suing Jakks and said Tuesday it struck the amendment with Jakks in July while gathering facts for the suit. Jakks issued a press release Tuesday on that deal which sent its stock sharply higher.
>
> WWE also said Jakks used a quote from one of its executives that was approved in July, but was no longer the view of the executive or WWE management.

144.    On November 5, 2004 the first of what would be several class action lawsuits was filed against JAKKS and numerous individual defendants. Many of the complaints seek damages for misrepresentations and omissions extending for as long as a five year period. They assert that the description in various Company public filings of the licensing agreements and JAKKS' relationship with WWE were false and misleading. They also alleged that the individual defendants reaped $37.6 million in proceeds by selling stock at inflated prices. For purposes of the contribution claims asserted herein, and without accepting the veracity of the allegations, Plaintiff incorporates the allegations of these class actions herein by reference.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

145.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered by the Company as a result of the breaches of fiduciary duty and other violations of law by the defendants.

146.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

147.    As a result of the facts set forth herein, plaintiff has not made any demand on the Company's Board of Directors to institute this action.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action. There is reasonable doubt that the Board can fairly address whether suit should be brought on behalf of the Company.

148.    The Board of Directors has already pre-judged the merits of this action, and has authorized JAKKS to issue press releases denying liability on its behalf, or any liability of the Individual Defendants.  Having reached its conclusions, no demand need be made on the Board as it will not likely reconsider.

149.    Nor could the Board assert the allegations herein alleged as they are and will be inconsistent with the stance to be taken by the Company in its defense to the WWE Litigation, and the securities class actions.  This is an irreconcilable conflict on interest which aligns he Board members with the individual defendants, and precludes them from vigorously asserting the rights of the Company against the individual defendants.  Such redress can only be obtained through the vehicle of a shareholder's derivative suit, and demand upon the Board is and shall be futile.

### FIRST CAUSE OF ACTION
### (Against the Individual Defendants  for Contribution
### Pursuant to Sections 10(b) and 21D of the Exchange Act)

150.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

151.   Defendants had a duty not to defraud the investing public by the dissemination of materially false and misleading press releases and the dissemination of materially false and misleading financial statements.

152.   These Individual Defendants have been sued in the Class Actions alleging that these individual defendants caused the Company to issue materially false financial statements concerning the WWE licenses, and, as a result, the Company and these defendants violated Section 10(b) of the Exchange Act.

153.   It is alleged in the Class Actions that these individual defendants acted with scienter in that these individual defendants knew that the public documents and statements issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.  As set forth elsewhere herein in detail, these individual defendants, by virtue of their receipt of information reflecting the true facts regarding JAKKS and its licenses, their control over and/or receipt of JAKKS' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning JAKKS, were active and culpable participants in the fraudulent scheme alleged herein.  These individual defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing alleged fraudulent scheme alleged in the Class Actions could not have been perpetrated over a substantial period of time without the knowledge and complicity of the personnel at the highest level of the Company, including these individual defendants. During the

Class

154.    During the Class Period, it is alleged in the Class Actions that the Individual Defendants  caused JAKKS to carry out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of JAKKS securities; and (iii) cause plaintiff and other members of the Class to purchase JAKKS stock at artificially inflated prices.

155.    As alleged in the Class Actions, these defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for JAKKS securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   These defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

156.    In addition to the duties of full disclosure imposed on these defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to disseminate truthful information promptly that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. §229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

157.   It is alleged in the Class Actions that these defendants, individually and in concert, directly and indirectly, by the use of the mails or other means or instrumentalities of interstate commerce, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of JAKKS as specified herein.   These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of JAKKS's value and performance and substantial growth.   This included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about JAKKS and its business, operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaging in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of JAKKS securities during the Class Period.

158.   As alleged in the Class Actions, as a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of JAKKS's securities was artificially inflated during the Class Period. Unaware of the fact that the market price of JAKKS's shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by these defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by these defendants but not disclosed in public statements during the Class Period, and Class members acquired JAKKS securities during the Class Period at artificially high prices and were damaged thereby.

159.    As alleged in the Class Actions, at the time of said misrepresentations and omissions, the Class members were unaware of their falsity, and believed them to be true.    Had the Class members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of JAKKS, which were not disclosed by these defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their JAKKS securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

160.    As alleged in the Class Action, by virtue of the foregoing, these individual defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5.

161.    It is further alleged in the Class Actions that the Company participated in the wrongful conduct and is equally liable for violation of  Section 10(b) of the Exchange Act. Assuming that the Company is liable, these individual defendants caused the Company to violate Section 10(b) of the Exchange Act , and incur liability for damages for violation of the Securities Fraud laws.

162.    If the Company is deemed to have violated the Federal Securities Laws, and incurs damages therefore, these individual defendants are liable to the Company for contribution pursuant to sections 10(b) and  21(D) of the Exchange Act.

## SECOND CAUSE OF ACTION
### (Against all Individual Defendants for or Breach of Fiduciary Duty)

163.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

164. The Individual Defendants owed and owe JAKKS fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe JAKKS the highest obligations of good faith, fair dealing, loyalty and due care.

165. The Defendants breached their fiduciary duties of care, loyalty, reasonable inquire, oversight, good faith and supervision.

166. Each of the Defendants had actual or constructive knowledge that they had caused JAKKS to improperly misrepresent the financial results of the Company and failed to correct publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment. Moreover, the Individual Defendants are asserted to have engaged in the actions alleged in the WWE Litigation, which would be a breach of duty to conduct the business of the Company only through lawful and proper means.

167. As a direct and proximate result of the Defendants' misconduct, JAKKS has suffered and will continue to suffer significant damages. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

## THIRD CAUSE OF ACTION
### (Against All Individual Defendants for Breach of Fiduciary and Unjust Enrichment and Abuse of Control)

168. Plaintiff incorporates by reference and realleges each and every allegation contained above, as if though fully set forth herein.

169. The Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence JAKKS, for which they are legally responsible. Moreover, defendants sold shares during the Class Period while in possession of material, non-public information, and are required to disgorge to the Company all profits received thereby.

40

170.   As a direct and proximate result of the Defendants' abuse of control, JAKKS has sustained significant damages, and Defendants are liable to the Company.

## FOURTH CAUSE OF ACTION
### (Against All Individual Defendants for Breach of Fiduciary through Mismanagement)

171.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as if though fully set forth herein.

172.   By their actions alleged herein, the Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of JAKKS in a manner consistent with the operations of a publicly held corporation.

173.   As a direct and proximate result of the Individual Defendants' gross mismanagement, JAKKS has sustained significant damages, arising out of the alleged material misstatements to the investing public, damages to the company arising from the pendency of the class actions and Individual Defendants are liable to the Company for all damages flowing therefrom, including the obligations for common law contribution.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.   Against the Individual Defendants for contribution pursuant to Sections 10(b) and 21(D) of the Exchange Act;

B.   Against all of the Defendants for the damages sustained by JAKKS as a result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

C.   Equitable and/or injunctive relief as permitted by law;

D.     Restitution and disgorgement of profits;

E.     Attorneys fees and Costs; and

F.     Any such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


Dated: November 29, 2004


Respectfully submitted,


Laurence D. Paskowitz (LP-7324)
**PASKOWITZ & ASSOCIATES**
60 East 42nd Street - 46th Floor
New York, NY 10165
(212) 685-0969 (tel.)
(212) 685-2306 (fax)

--and--

ROY L. JACOBS (RLJ 0286)
60 East 42nd Street - 46th Floor
New York, NY 10165
(212) 867-1156 (tel.)
(212) 504-8343 (fax).


*Attorneys for Plaintiff*